IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WHAM-O HOLDING, LTD, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ARCADE SPORTS, et al.,<br><br>    Defendants. | **UNDER SEAL**<br><br><br>CIVIL ACTION NO.<br>1:25-CV-07300-JPB |

**TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER
AND ORDER TO SHOW CAUSE**

This matter is before the Court on Wham-O Holding Ltd and Intersport Corporation (collectively, "Plaintiffs") *Ex Parte* Motion for Temporary Restraining Order ("Motion for TRO") [Doc. 3]. As discussed below, Plaintiffs have satisfied the requirements for the issuance of an *ex parte* temporary restraining order and the additional relief requested.

**I.   APPLICABLE LEGAL STANDARDS**

A court will issue a temporary restraining order where the requesting party demonstrates the following four factors: (1) it has a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury if the order is not granted; (3) the threatened injury to the plaintiff outweighs the harm the relief would inflict on the non-movant; and (4) entry of the order would serve the public interest. Schiavo ex. rel Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005); Cathedral Art Metal Co. v. Divinity Boutique, LLC, No. 1:18-CV-

1

141, 2018 WL 566510, at *4 (N.D. Ga. Jan. 26, 2018) (applying the four-part test and granting a preliminary injunction in a Lanham Act case).

Courts may issue a temporary restraining order without notice to the adverse party where the facts in an affidavit demonstrate the moving party will suffer immediate and irreparable injury, loss or damage before the adverse party can be heard in opposition, and the movant's attorney certifies in writing why notice should not be required. Fed. R. Civ. P. 65(b)(1). Where a defendant's identity is known and notice can be feasibly given, the court may still grant an *ex parte* seizure order if providing notice to the defendant would "render fruitless the further prosecution of the action." AT&T Broadband v. Tech Commc'ns, Inc., 381 F.3d 1309, 1319 (11th Cir. 2004) (quoting In re Vuitton et Fils, S.A., 606 F.2d 1, 5 (2d Cir. 1979)). "The weight of authority around the country appears to favor the granting of *ex parte* seizure orders in trademark counterfeiting cases, where fake versions of well-known brands are deliberately passed off to the public as the genuine article." Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen, 548 F. Supp. 248, 249 (S.D. Fla. 1982). The justification for an *ex parte* seizure order is even more compelling where a significant amount of evidence pertaining to the counterfeiting activity is in electronic form and therefore subject to quick, easy and untraceable destruction by the defendants. Dell Inc. v. BelgiumDomains, LLC, No. Civ. 07-22674, 2007 WL 6862341, at *2 (S.D. Fla. Nov. 21, 2007); see also Chanel, Inc. v. chanel255.org, No. 12-21762-CIV, 2012 WL 12845630, at *5 (S.D. Fla. May 17, 2012).

A request for permanent injunctive relief and disgorgement of Defendants' profits from

counterfeiting pursuant to 15 U.S.C. § 1117 as well as a request for an award of attorney's fees are requests for relief in equity. Requests for equitable relief invoke the court's inherent equitable powers to order preliminary injunctive relief, including an asset freeze, to assure the availability of permanent relief. Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 987 (11th Cir. 1995). Such asset freezes are particularly appropriate against sellers of counterfeit goods who are likely to hide their ill-gotten profits if their assets are not seized. Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559 (9th Cir. 1992).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court, having reviewed Plaintiffs' Motion, Memorandum and supporting declarations and evidence, makes the following findings of facts and conclusions of law:

### A. Plaintiffs' Trademarks

1) Plaintiffs have long engaged in the business of manufacturing and marketing in interstate commerce toys called "flying discs" sold under the FRISBEE trademarks. Plaintiffs own the following FRISBEE trademarks: Trademark Registration Nos. 679186, 970089, 3410998 and 4046202 (collectively, "Plaintiffs' Marks").

### B. Defendants' Advertising and Sale of Counterfeit and Infringing Goods

2) Each Defendant is believed to be a non-U.S. entity, association or individual located in China or elsewhere in Asia, each of whom sells, offers for sale, distributes and/or advertises goods through its virtual storefronts on various e-commerce marketplaces, such as PayPal, Amazon.com, Inc., Temu and Walmart,

Inc. (each a "Marketplace" and collectively the "Marketplaces").

3)   Each Defendant uses in commerce a reproduction, counterfeit, copy or colorable imitation of one or more of Plaintiffs' Marks on or in connection with the sale, offer for sale, distribution or advertising of goods on their respective virtual storefronts on the Marketplaces ("Counterfeit Products").

4)   Each Defendant has offered Counterfeit Products for sale throughout the United States, including in Georgia.  Each Defendant is willing to engage in commercial transaction with residents of the United States and ship Counterfeit Products to the United States.

5)   Each Defendant also accepts payment for its goods in U.S. dollars through, for example, a variety of payment processors, banks, escrow services, money transmitters, the Marketplaces themselves and other companies that engage in the processing or transfer of money of or on behalf of Defendants by virtue of their operation of virtual storefronts on any of the Marketplaces (collectively referred to hereafter as, "Financial Institutions").

6)   Defendants are subject to the personal jurisdiction of this Court pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, and exercising jurisdiction over Defendants is consistent with the United States Constitution and its laws.  Based on the facts set forth above, it is reasonable for Defendants to expect that they may be sued in the United States.  SEC v. Carrillo, 115 F.3d 1540, 1542–47 (11th Cir.

4

1997) (holding that the court had personal jurisdiction over a foreign corporation where the defendant placed ads for securities in two airlines' in-flight magazines, mailed offering materials directly to U.S. investors and maintained U.S. bank accounts to receive payment from investors); <u>Louis Vuitton Malletier, S.A. v. Mosseri</u>, 736 F.3d 1339, 1355–58 (11th Cir. 2013) (affirming jurisdiction over non-resident who sold counterfeit products through fully-interactive website).

7) Plaintiffs have never authorized Defendants to use any of Plaintiffs' Marks in the advertising, promotion or sale of any goods in the United States.

8) Plaintiffs have established that the Counterfeit Products offered for sale by Defendants are not genuine and that Defendants are using one or more of Plaintiffs' Marks or a colorable imitation of Plaintiffs' Marks on or in connection with the advertising and promotion of their Counterfeit Products.

9) Plaintiffs have established that they are substantially likely to succeed on the merits of their trademark infringement claims:

    a) Plaintiffs own valid federal trademark registrations for Plaintiffs' Marks;

    b) The Counterfeit Products that Defendants are advertising and offering for sale are not genuine;

    c) Defendants are using spurious marks that are identical with, or substantially indistinguishable from, one or more of Plaintiffs' Marks in commerce on or in connection with the advertising, offering for sale and/or sale of the

        Counterfeit Products; and

    d)    Defendants' use of Plaintiffs' Marks or colorable imitations of Plaintiffs' marks is likely to cause consumer confusion, mistake or deception as to the source or origin of the Counterfeit Products; and

    e)    Alternatively and/or additionally, each Defendant is using in commerce a word, term, name, symbol or device, or a combination thereof, or a false or misleading representation of fact on or in connection with its goods in a manner that is likely to cause confusion, or to cause mistake, or to deceive, as to the affiliation, connection, or association of each Defendant with Plaintiffs, or as to the origin, sponsorship, or approval of each Defendant's goods or commercial activities by Plaintiffs.

10)    Under 15 U.S.C. § 1116(a), Plaintiffs are entitled to a rebuttable presumption of irreparable harm because Plaintiffs are seeking a temporary restraining order or a preliminary injunction and have demonstrated a likelihood of success on the merits. As held in the preceding paragraph, Plaintiffs have demonstrated a likelihood of success on the merits and is, therefore, automatically entitled to a presumption of irreparable harm, thereby satisfying the second factor of the temporary restraining order and preliminary injunction analysis.

11)    Even in the absence of the rebuttal presumption, Plaintiffs have shown that they are likely to suffer irreparable harm if an injunction does not issue. The

Counterfeit Products are of inferior quality to Plaintiffs' genuine goods, misleading consumers as to the true quality of Plaintiffs' products and causing consumer confusion, mistake and deception, all to the detriment of Plaintiffs' goodwill. The continued sale of the Counterfeit Products threatens Plaintiffs with the loss of control over its reputation and loss of the considerable goodwill it has established with customers. Moreover, Plaintiffs have established that the Counterfeit Products typically do not meet applicable product safety or labeling requirements. This is more than sufficient to establish a likelihood of irreparable harm. Ferrellgas Partners, L.P. v. Barrow, 143 F. App'x 180, 190–91 (11th Cir. 2005) ("'[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control and nature and quality of the defendants' goods.'" (alteration in original) (quoting Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1998))); Crossfit, Inc. v. Quinnie, 232 F. Supp. 3d 1295, 1316 (N.D. Ga. 2017).

12) It is likely that Plaintiffs will suffer immediate and irreparable loss, damage or injury unless Plaintiffs' request for *ex parte* relief is granted:

   a) It is likely that Defendants will continue to sell counterfeit and infringing goods through their e-commerce Marketplace storefronts in the absence of the requested TRO;

   b) As a result, it is likely that consumers will continue to be misled, confused

and disappointed by the quality of these products, thereby significantly and irreparably damaging Plaintiffs' valuable goodwill; and

c) Plaintiffs will continue to suffer lost sales of genuine products as the result of the lower-cost Counterfeit Products offered for sale by Defendants.

13) The balance of harms favors Plaintiffs. If Plaintiffs are required to provide Defendants notice of the Application for TRO or if the TRO is denied, Defendants will be able to shut down their Marketplace storefronts, transfer their ill-gotten gains away from the Marketplaces and otherwise take steps to hide their infringing conduct and prevent Plaintiffs from obtaining meaningful relief. In contrast, if the Court grants the requested *ex parte* TRO, Defendants will be prohibited from continuing to advertise, offer for sale and sell Counterfeit Products to consumers in the United States and may be required to disgorge their ill-gotten gains from the past sale of such Counterfeit Products, neither of which constitutes any substantial harm.

14) Plaintiffs have further demonstrated that this TRO should be granted *ex parte* to avoid giving Defendants an opportunity to destroy relevant evidence, much of which is in electronic form. If Plaintiffs give Defendants notice of its Application for TRO, Defendants are likely to delete their existing online e- commerce Marketplace storefronts, transfer any ill-gotten gains away from the Marketplaces and otherwise hide their identities, cover up evidence of their infringing activities

and shield their ill-gotten assets in an effort to avoid liability and prevent Plaintiffs from achieving a meaningful recovery, including financial compensation and permanent injunctive relief. Foreign parties that sell Counterfeit Products often "disappear" when notified that their conduct is unlawful, only to set up a new online storefront under a new identity, with new financial accounts.

15) Granting Plaintiffs an *ex parte* TRO will also be in the public's interest. It will remove from the stream of commerce counterfeit and infringing goods that do not meet Plaintiffs' quality control requirements, thereby preventing further consumer confusion, mistake or deception.

16) Plaintiffs have requested a permanent injunction and recovery of Defendants' ill-gotten profits from their sale of Counterfeit Products pursuant to 15 U.S.C. § 1117(a).

17) By requesting equitable relief, Plaintiffs have invoked this Court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief. Levi Strauss, 51 F.3d at 987.

18) Defendants are likely to destroy evidence of their counterfeiting activities—including their electronic storefronts, payment histories and accounts with financial institutions—or hide or transfer any ill-gotten proceeds from the sale of Counterfeit Products outside of the jurisdiction of this Court, unless those assets are frozen or otherwise restrained.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order is **GRANTED** as follows:

1) Each Defendant (as noted in the Complaint and on the docket), its officers, directors, employees, agents, subsidiaries, distributors and all persons in active concert or participation with any Defendant having notice of this Order are hereby ordered to temporarily:

   a) Cease or refrain from manufacturing, advertising, offering for sale, selling, distributing, destroying, selling off, transferring or otherwise disposing of any Counterfeit Products;

   b) Cease or refrain from manufacturing, advertising, offering to sell, selling, reproducing or distributing any goods bearing Plaintiffs' Marks or any confusingly similar trademarks, other than genuine products manufactured or distributed by Plaintiffs or their authorized manufacturers and distributors; and

   c) Cease or refrain from destroying, selling off, transferring or otherwise disposing of any documents, electronically stored information or financial records or assets of any kind, relating to the manufacture, importation, sale, offer for sale, distribution or transfer of any Counterfeit Products;

   d) Cease or refrain from using Plaintiffs' Marks, or any confusingly similar trademarks, on or in connection with any virtual storefront that Defendants

              may own, operate or control on any Marketplace;

    e)     Cease or refrain from any and all use of Plaintiffs' Marks, or any confusingly similar trademarks, as metatags on any webpage (including the title of any web page), in any advertising links to other websites, from search engines' databases or cache memory and any other form of use of such terms that are visible to a computer user or serves to direct computer searches to virtual storefronts registered by, owned by or operated by Defendants on any Marketplace; and

    f)     Cease or refrain from altering, disabling, closing or transferring ownership of any virtual storefront on any Marketplace during the pendency of this Action, or until further order of the Court.

2)     For the duration of this suit, each Defendant must preserve all documents and electronically stored information arising from or related to its sale, offering for sale, advertising or promotion of Counterfeit Products through its virtual storefronts located on the Marketplaces.

3)     All financial institutions that receive actual notice of this Order shall immediately comply with the following: attach and freeze all funds in any accounts owned, controlled or utilized by, or associated with Defendants, or otherwise prohibit the transfer of any funds out of any such accounts, and divert any frozen funds and any additional funds that may be transferred into the accounts into a holding account at

the Marketplace or the respective Financial Institution for the trust of the Court, with such frozen funds and/or holding accounts being held, maintained and/or located exclusively within the United States.

4) Within seven days of receiving actual notice of this Order, all Financial Institutions shall provide a report to Plaintiffs for each Defendant having any account with any Financial Institution, the report to include, at a minimum, the following:

   a) Legal name and email address of each Defendant;

   b) Current account balances and amount of funds attached, frozen and being held in trust pursuant to this Order; and

   c) Identity of all financial accounts linked to or associated with each of Defendants' accounts associated with the virtual storefronts on the Marketplaces, or from or to which funds have been transferred from the attached accounts, including the name of the financial institution, account numbers, routing numbers, and other relevant data to allow Plaintiffs to seek further application of this Order.

5) No funds restrained by this Order shall be transferred or surrendered by any Financial Institution or Marketplace for any purpose (other than pursuant to a chargeback made pursuant to their security interest in the funds) without the express authorization of the Court.

6) Upon receipt of notice of this Order, each Marketplace on which a Defendant

maintains a storefront or account is ordered to immediately:

   a) Provide to Plaintiffs the name and email address of each Defendant having an account or store on the Marketplace;

   b) Freeze all funds held or received by the Marketplace for any Defendants' benefit; and

   c) Disable the Marketplace storefront or account associated with each Defendant and cease providing any services to Defendants.

7) Plaintiffs may notify the Marketplaces and Financial Institutions of this Order by electronic means, including by electronic mail.

8) Plaintiffs are authorized to issue expedited written discovery related to:

   a) The identities and locations of Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with any Defendant, including all known contact information, including any and all associated e-mail addresses; and

   b) The nature of Defendants' operations and all associated sales, methods of payment for services and financial information, including, without limitation, identifying information associated with the Seller Aliases and Defendants' financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Seller Aliases.

9) Plaintiffs are authorized to issue any such expedited discovery requests by electronic means, including by electronic email. Defendants shall respond to any such discovery requests within three business days of being served by electronic email.

10) This Order shall apply to Defendants, their associated virtual storefronts on the Marketplaces and any other websites, domain names, seller identification names, e-commerce stores or Financial Institution accounts which are being used by Defendants for the purpose of advertising, offering for sale and selling any of the Counterfeit Products at issue in this action and/or unfairly competing with Plaintiffs.

11) Any Defendant or Financial Institution account holder may petition the Court to modify the asset restraint set out in this Order.

12) A hearing by video conference is set before this Court, technical details to follow, on **January 6, 2026, at 11:00 AM**, at which time Defendants and/or any other affected persons may challenge the appropriateness of this Order and move to dissolve the same, shall provide a reasonable estimate of their potential lost sales with supporting documentation and requested bond amount and shall appear and show cause why a preliminary injunction should not issue, at which time the Court will hear argument on Plaintiffs' requested preliminary injunction.

13) **SERVICE BY ALTERNATE MEANS**: After Plaintiffs' counsel has received

confirmation that the Financial Institutions have restrained Defendants' funds as directed herein, Plaintiffs shall serve copies of the Complaint, Motion for Temporary Restraining Order and this Temporary Restraining Order on each Defendant by electronic mail using email addresses provided by the Marketplaces, Financial Institutions or Defendants themselves or by other electronic means reasonably calculated to provide notice to all Defendants.

14) Any response or opposition to Plaintiffs' Motion for Preliminary Injunction must be filed and served on Plaintiffs' counsel by **December 31, 2025**, and filed with the Court, along with Proof of Service. Plaintiffs shall file any reply memorandum prior to the hearing set for **January 6, 2026**. The above dates may be revised upon stipulation by all parties and approval of this Court. **Defendants are on notice that failure to appear at the hearing may result in the imposition of a preliminary injunction against them pursuant to 15 U.S.C. § 1116(d), Federal Rule of Civil Procedure 65, 28 U.S.C. § 1651(a) and the Court's inherent authority**.

15) Plaintiffs are ordered to remit a bond in the amount of $10,000 within seven days of this Order.

This Temporary Restraining Order expires within fourteen days unless extended for good cause.

**SO ORDERED** this 23rd day of December, 2025.

_____
J. P. BOULEE
United States District Judge